**HANDICRAFT BLOCK LIMITED PARTNERSHIP, petitioner, Appellant,**

v.

**CITY OF MINNEAPOLIS, Respondent.**

**No. C2–98–2237.**

Supreme Court of Minnesota.

June 1, 2000.

Larkin, Hoffman, Daly & Lindgren, Ltd., Gary A. Van Cleve, Bloomington, for appellant.

Jay H. Heffern, Minneapolis City Attorney, Carol Lansing, William C. Dunning, Assistant Minneapolis City Attorneys, Minneapolis, for respondent.

## OPINION

GILBERT, Justice.

This case arises out of appellant's judicial challenge to the respondent City of Minneapolis' (City) heritage preservation designation of two of appellant's buildings.

Appellant, Handicraft Block Limited Partnership (Handicraft), owns the Handicraft Guild Building and an adjacent building (Buildings) located in downtown Minneapolis. The City designated the exteriors of both Buildings for heritage preservation. Handicraft argues that the designation was arbitrary. Handicraft filed a writ of certiorari in the court of appeals seeking review of the designation pursuant to Minn.Stat. § 606.01 (1998) and Minn. R. Civ.App. P. 115. The court of appeals analyzed the factors we delineated in *Minnesota Center for Environmental Advocacy v. Metropolitan Council*, 587 N.W.2d 838 (Minn.1999) (*MCEA*). See *Handicraft Block Ltd. Partnership v. City of Minneapolis*, 598 N.W.2d 420, 422–24 (Minn.App.1999). Under *MCEA*, the court of appeals determined that the City's decision was not quasi-judicial but rather quasi-legislative, and because quasi-legislative acts are not reviewable by writ of certiorari, the court discharged the writ, citing a lack of jurisdiction. See *Handicraft*, 598 N.W.2d at 424. We granted review of the court of appeals' decision and must now decide only the narrow question of whether the City's decision to designate the Buildings is quasi-judicial and therefore reviewable by writ of certiorari. We reverse and remand.

The Handicraft Guild Building was completed in 1907. It is a three-story brick building, built in the Georgian Revival style. It was designed by William Channing Whitney, an architect credited with introducing Georgian Revival style to Minneapolis. It was built for and occupied from 1907 to 1918 by the Handicraft Guild, an arts organization during the brief period when the Arts and Crafts movement flourished in Minnesota.

Handicraft owns both the Handicraft Guild Building, 89–91 South 10th Street, and an adjacent building at 1004 Marquette Avenue. The entire block on which the Buildings sit has been identified for redevelopment in the supplemental statement to the City's current comprehensive plan; the "Downtown 2010;" and in its proposed new comprehensive plan, "The Minneapolis Plan." In addition, the Buildings are not included on a map in the "Downtown 2010" plan of 35 buildings in downtown Minneapolis considered historic buildings. Nor are they listed on the Heritage Preservation Commission's (HPC) "800 List," a list compiled by the HPC of about 800 structures/sites potentially eligible for heritage designation. The City initially investigated the heritage preservation designation of the Handicraft Building in 1994 when it commissioned the designation study that it eventually relied upon in 1998. The appellant objected to the designation and heard nothing from the City until 1998. In accordance with the comprehensive plan's vision for redevelopment, Handicraft entered into a $9,000,000 option contract in 1998 to sell the Buildings to Ryan Properties for development of a luxury hotel. Ryan Properties' inquiry about the historical attributes of the property triggered the City's renewed interest in pursuing heritage designation.

By a letter dated June 25, 1998, the City gave Handicraft written notice of its intention to seek heritage designation [1] for the Handicraft Guild Building. The first pub-

---

1. The designation procedure is as follows: (1) HPC directs a study by the city planning department of the building to be designated; (2) the report is referred to the city planning commission for review and recommendation to the HPC; (3) HPC reviews the report of the city planning commission and then makes its recommendation to the city council; (4) if it is a proposal of designation, the HPC must send the proposal to the Minnesota Historical Society for review and comment in writing within 60 days; (5) the zoning and planning commission of the city council holds a public hearing, notice of which is sent by mail to the property owner and other nearby property owners and by publication to the public, and makes a recommendation; and (6) the city council, with the benefit of the recommendations of the HPC and other committees, may decide to designate the property by ordinance or resolution. See Minneapolis, Minn., Code of Ordinances (MCO) §§ 34.40(a)-(c), 34.50 (1999).

lic hearing was conducted on July 14, 1998, by the City's HPC.[2] At that time, Handicraft learned that 1004 Marquette was also being considered for designation. Because no formal notice of such a designation had been given to Handicraft, consideration of 1004 Marquette was postponed until the next HPC meeting, which occurred on August 11, 1998. The exterior of the Handicraft building was recommended for designation at the July 14, 1998, meeting with a vote by a non-quorum, later ratified by a quorum of the HPC. On August 11, 1998, the HPC recommended designation of the exterior of 1004 Marquette, again without a quorum present but later ratified by a quorum.

The matter was then forwarded to the city planning commission, which conducted a hearing on August 24, 1998, and also recommended designation of the exteriors of both Buildings. The zoning and planning commission of the city council next considered the designation on September 22, 1998, at a public hearing. It, too, voted to recommend designation. The full city council designated the exterior of the Buildings on October 2, 1998. At each stage of these proceedings, Handicraft was represented by counsel who presented written and oral evidence opposing designation. Testimony was presented both for and against designation. The mayor approved the designation on October 8, 1998.

Once the Buildings are designated, the HPC has the responsibility to review city permits for all of the following: remodeling, repairing, moving, or destroying a building in whole or in part which would change the exterior. See Minneapolis, Minn., Code of Ordinances §§ 34.60(a)-(g), 34.70 (1999). An appraiser hired by Handicraft estimated that the market value of the property put to its highest and best use, which it found to be razing the existing buildings and redeveloping "with a commercial use such as an office building or hotel," would be between $3,700,000 and $5,000,000. With designation, the properties are worth between $600,000 and $1,000,000.

Handicraft appealed the designation by writ of certiorari to the court of appeals pursuant to Minn.Stat. § 606.01 and Minn. R. Civ.App. P. 115. The writ was issued on December 4, 1998. On December 11, 1998, the court of appeals ordered informal memoranda regarding the jurisdiction of the court. The court of appeals noted that it only had jurisdiction by writ of certiorari to review quasi-judicial, not quasi-legislative, proceedings. Both parties argued that the decision was quasi-judicial in their submitted informal memoranda. After submission, we decided MCEA, 587 N.W.2d 838. The court of appeals issued an order deferring decision on the jurisdiction question and requested the parties to reconsider the issue in light of our MCEA opinion. See In re Handicraft Guild Building, No. C2–99–2237 (Minn.App. Feb. 9, 1999). The City then reversed its position, arguing that its decision was quasi-legislative, not quasi-judicial. At the court of appeals, the City conceded that its proceedings resulted in a binding decision regarding a disputed claim, the third factor in MCEA. On August 17, 1999, the court of appeals filed a decision holding that designation of the Buildings involved quasi-legislative proceedings and therefore, discharged the writ. See Handicraft, 598 N.W.2d at 424. We granted Handicraft's petition for further review.

▮▮▮ We review de novo the issue of jurisdiction without deference to the ruling of the lower court. See MCEA, 587

---

2. The enabling legislation for a municipality to establish commissions "to preserve and promote its historic resources" is Minn.Stat. § 471.193, subd. 2 (1998). The commission's powers are limited to "those delegated or assigned by the ordinance establishing the commission." Minn.Stat. § 471.193, subd. 3 (1998). Minneapolis Code of Ordinances Chapter 34 establishes the HPC and outlines its duties. The HPC itself cannot designate buildings. Instead, MCO § 34.40 says that the HPC "shall recommend to the city council buildings * * *.* to be designated * * * for heritage preservation * * *."

N.W.2d at 842. "Certiorari is an 'extraordinary remedy' only available to review judicial or quasi-judicial proceedings and actions." *Id.* (citing *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 414 (Minn.1981)). Legislative actions may not be reviewed by certiorari. *See id.* Thus, whether the action of the City is reviewable by certiorari ultimately is dependent upon whether the City acted in a quasi-legislative or in a quasi-judicial capacity when it designated the Buildings for heritage preservation.

We have recently articulated the factors to be used in distinguishing between quasi-judicial and quasi-legislative proceedings. *See MCEA,* 587 N.W.2d at 842; *Meath v. Harmful Substance Compensation Bd.,* 550 N.W.2d 275, 279 (Minn.1996). In *Meath,* we held that "quasi-judicial conduct is marked by an investigation into a disputed claim and a decision binding on the parties." 550 N.W.2d at 279. In *MCEA,* we added a third factor, proposed by the concurrence in *Meath,* to the framework for determining if proceedings are quasi-judicial or quasi-legislative. *See* 587 N.W.2d at 842. "[T]he three indicia of quasi-judicial actions can be summarized as follows: (1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim." *Id.*

### I.

■ The first *MCEA* factor requires us to consider whether the respondent "investigated and weighed evidentiary facts relevant to a disputed claim" in designating the Buildings. *Id.* Both quasi-judicial and quasi-legislative proceedings have as "the ultimate goal * * * to reach an informed decision on relevant and sometimes conflicting facts." *Id.* However, quasi-judicial proceedings involve "determining facts for the purpose of reaching a legal conclusion in resolution of adversarial claims." *Id.* at 843. In reaching a determination on this factor it is useful to compare the process involved in *MCEA,* where we concluded that this factor had not been met, with the process involved here.

In *MCEA,* the government body making the decision we were assessing was the Metropolitan Council, a political subdivision of the State of Minnesota and the designated metropolitan planning organization for the Twin Cities metropolitan area. *See id.* at 839 (citing 23 U.S.C. § 134(b) (1994)). The Metropolitan Council was involved in a complex planning process concerning construction of a proposed four-lane bridge across the St. Croix River from Stillwater, Minnesota to St. Joseph/Houlton, Wisconsin, which would include expansion of Minnesota Trunk Highway 36. *See MCEA,* 587 N.W.2d at 841. No particular parties were given notice or the right to participate in a public hearing regarding the proposed project because there was no public hearing required under the relevant legislation. *See id.* at 839 nn. 2–3. Instead, the public generally was given the right to "comment" on the long-range plans—the Metropolitan Development Guide/Blueprint (Blueprint) and the 1996 Transportation Policy Plan (TPP)—and the plan that contained the specific proposed projects to meet those long-range plans, the Transportation Improvement Plan (TIP). *See id.* at 839–41 nn. 2 & 4, (citing 23 U.S.C. §§ 134(g) and (h)(1) (1994)). We held that the process used by Metropolitan Council to gather information was vastly different from the judicial process involved in reaching a legal conclusion in resolution of adversarial claims. *See id.* at 842–43. Instead, we held that the proceedings were more typical of the legislative process than judicial proceedings. *See id.* at 842. Therefore, we did not characterize the process as quasi-judicial under the *Meath* indicia. *See id.* at 843.

Here, the designation proceedings are more typical of judicial proceedings than legislative proceedings because they involve investigating and determining facts for the purpose of reaching a legal conclusion regarding the disputed claim of

whether this building is to be designated. They are akin to a hearing on a conditional use permit directed at a specific property and related to specific property rights. Although the proceedings differ from formal judicial proceedings, they are still quasi-judicial in nature.

■ In contrast to the proceedings in *MCEA*, Handicraft was a formally identified party to the proceedings. Notice was sent specifically to Handicraft regarding the possible designation of its property. Further, Handicraft was expressly invited to present evidence on its behalf at public hearings and was given a list of the designation factors, presumably so Handicraft could prepare arguments against designation, if it was opposed. Four separate public hearings were held. Handicraft attended each public hearing and was represented by counsel and submitted oral testimony and written evidence opposing the designation. These were adversarial proceedings. Evidence regarding the property and the designation factors was taken. Though no rebuttal evidence was necessarily required and testimony was not under oath, evidence was being offered both in support of and in opposition to the legal claim by the City to designate Handicraft's properties for historic preservation. Although initiated by the City, the conduct of these proceedings was no different in format from that of typical conditional use permit or variance proceedings, which we have acknowledged are quasi-judicial proceedings. *See, e.g., Honn*, 313 N.W.2d at 416. Though they were not conducted as formally as a trial, we have not held that quasi-judicial proceedings must be. In *Barton Contracting Co., Inc. v. City of Afton*, 268 N.W.2d 712, 716 (Minn.1978), we acknowledged that "[t]he statements made at such a public hearing [for a conditional use permit], unlike a regular judicial proceeding, are not given under oath and are not limited by the traditional rules of evidence. They are usually broad expressions of opinion in favor or against the application."

Finally, the designation determination of Handicraft's properties involved a disputed claim. The City was not making a decision bearing on an open class of persons and properties. Rather, it directed its efforts to the particular interests of a specific property and property owner. The City identified one property/party (89–91 South 10th Street and 1004 Marquette Avenue/Handicraft) and then collected facts about that property from Handicraft and other interested members of the public to make the designation determination. There is a significant difference between the opportunity given to the public at large in *MCEA* to comment on possible future highway development and the opportunity given to a specific property owner, targeted by the City, to be heard and present evidence regarding the immediate heritage preservation designation of a single property.

In this analysis, we must look to the proceedings as a whole. In doing so, we note that the City's proceedings are in stark contrast to the Metropolitan Council's broad policy and planning decision process in *MCEA*. The City gathered, investigated and weighed relevant information and facts for the specific purpose of reaching a legal conclusion, designation with all of the attendant responsibilities and constraints, in resolution of a particular adversarial claim. This factor indicates that the proceedings were quasi-judicial.

## II.

■ We must next determine whether respondent applied a prescribed standard to the facts presented in deciding to designate Handicraft's Buildings. *See MCEA*, 587 N.W.2d at 843. In *MCEA*, we considered whether legislation that required that projects selected for the TIP be "consistent with" the long-range plan embodied in the Blueprint and TPP provided prescribed standards. *See id.* We held that the "introductory goals" of the Blueprint and "16 considerations" of the TPP were broad and diverse elements that were not

intended to serve as a prescribed standard. *See id.* at 843–44. The TPP statute made it mandatory for the authorities only to "consider" the list of 16 factors in making the TPP, rather than requiring them to find that one or more of the factors had been met. *See id.* at 843 & n. 7 (citing 23 U.S.C. 134(f) (1994 & Supp.1996)). Further, we found that the 16 TPP factors were "not necessarily consistent" with each other, which demonstrated the different policy choices that had to be incorporated into the TPP. *Id.* at 843. Finally, under federal law, to be "consistent with" required only "congruity" or "compatibility" rather than strict compliance. *Id.* at 844. Ultimately, this court held that the "non-specific nature" of the goals and considerations and the "flexible compliance" inherent in the use of the statutory language "consistent with" meant that the Metropolitan Council did not have a prescribed standard governing its TIP decision. *Id.*

In contrast to *MCEA,* the standards here are both specific and prescribed. Although the City describes the standards as "guidelines" and "considerations," the City also indicated an intent that the guidelines control the designation decision by using mandatory language that not only dictated what should be considered but also was designed to control what could be designated. The designation factors are contained in the comprehensive plan, which states: "The current guidelines utilized by the Heritage Preservation Commission for review are: A. Primary Considerations. Structures, lands, areas or districts selected for heritage designation *shall be* of historic or aesthetic merit and *shall satisfy* at least one of the following general guidelines." (Emphasis added).

We conclude that these guidelines,[3] when applied to a specific property, establish specific criteria that curtail the discretion of the City when it chooses to desig-

**3.** The standards are located in the City of Minneapolis Comprehensive Plan, "Plan for the 1980's," (which is currently in effect).

A. Primary Considerations

Structures, lands, areas or districts selected for heritage designation shall be of historic or aesthetic merit and shall satisfy at least one of the following general guidelines.

1. Structures, lands, areas or districts considered for preservation shall exemplify the broad trends of cultural, political, economic or social history; however, they may also represent an unusual counter development to such broad trends.

2. Structures, lands, areas or districts considered for preservation may be those associated with the lives of historic personages, with important events or with strong ethnic, community, or City identity.

3. Structures, lands, areas or districts considered for preservation may display the distinguishing characteristics of an architectural type inherently valuable for study or method of construction.

4. Structures, lands, areas or districts considered for preservation may be notable works of master builders, engineers, designers, artists, craftsmen or architects.

B. Secondary Considerations

In addition to the guidelines of primary consideration the following guidelines shall be considered.

1. The setting of structures and areas shall be considered in light of appropriateness, visibility and accessibility. There shall be assurance that the structure or area shall not be hazardous to the health and safety of the community.

2. The economic and physical soundness of a candidate for heritage preservation shall be appraised after discussion of the candidate's significance.

a. Economic Soundness

(1) The expenses of restoration and continued maintenance shall be considered before designation.

(2) Alternate reuses for structures shall be considered if the continuance of the present use is doubtful.

(3) Reuses of designated structures or lands shall not destroy the integrity of the structure, land or area.

b. Physical Soundness

(1) Consideration shall be given to the maintained integrity of original design materials and workmanship of structures, lands, areas or districts.

(2) Modifications needed to bring structures and areas in conformance with health and safety standards and with building codes and standards shall be considered.

nate that property. By using language that is mandatory and not permissive, the City circumscribed its ability to designate any building for heritage preservation that did not meet one of the four listed criteria. The mandatory language "shall satisfy" requires strict rather than flexible compliance with one of the four primary considerations.

Further, though the four primary considerations that must be satisfied are distinct, they are not inconsistent or lacking in specificity. The standards require an investigation of specific types of facts relating to a specific property that is selected·for heritage designation. In order for a building to be designated, it must either be associated with a significant historical trend or counter-trend, historic persons or events, distinctive architecture, or notable architects or craftsmen. The standards are not merely goals, they are specific criteria for the City to consider. They provide the framework for the facts the City investigates and findings the City makes regarding the property, its use, its history and its owners in order to justify designation. It is well within the province of a reviewing court to determine whether the evidence gathered to support one of these specific guidelines provides a "substantial basis" for the challenged decision. *Honn,* 313 N.W.2d at 414 (holding that the "traditional standard of review" for certiorari review of quasi-judicial decisions is "whether the evidence provides a substantial basis for the decision"). Finally, the specificity of such standards in curtailing the relevant inquiry with respect to a specific property is analogous to that of the standards governing the issuance of conditional use permits or variances, which we recognize as quasi-judicial proceedings. *See, e.g., Earthburners, Inc. v. County of Carlton,* 513 N.W.2d 460, 462 (Minn.1994) (quoting the county ordinance that states in part that the use should not "be injurious to the use and enjoyment of other property in the immediate vicinity * * * nor substantially diminish and impair property values;" or "impede the normal

and orderly development" of the area); *VanLandschoot v. City of Mendota Heights,* 336 N.W.2d 503, 507 n. 3 (Minn. 1983)· (quoting ordinance that requires council to determine in part that proposed variance will not "endanger the public safety," "in any other way impair health, safety, comfort, morals," or "in any other respect be contrary to the intent of this Ordinance").

Simply because the City retains some discretion over the initial determination of whether to even consider designation does not mean that a reviewing court cannot determine under these guidelines whether once that decision is made, the decision to designate was arbitrary and capricious. *See VanLandschoot,* 336 N.W.2d at 508 (holding that the general standard of review for quasi-judicial zoning matters is whether the action was arbitrary and capricious). The guidelines establish specific requirements, at least one of which must be satisfied in order to designate a property for heritage preservation. We conclude that this factor indicates that the proceedings were quasi-judicial.

### III.

The third factor from *MCEA* is whether the City's decision to designate Handicraft's property "amounts to a binding decision that affected a disputed claim." 587 N.W.2d at 844. The court of appeals did not inquire into this indicia because "[t]he city admits that its decision to designate the buildings for heritage preservation creates both rights and responsibilities for relator, and therefore concedes that this prong indicates the decision is quasi-judicial rather than quasi-legislative." *Handicraft,* 598 N.W.2d at 423–24. Because of the City's concession, Handicraft did not seek review of this issue, nor did the City in its response to Handicraft's petition. *See generally* Minn. R. Civ.App. P. 117, subds. 3–4. Therefore, we decline to review the arguments made by the City with respect to this factor. We conclude that

this factor indicates that the decision is quasi-judicial.

Looking at all of the factors together, we hold that the proceedings of the City in designating the Handicraft Buildings for heritage preservation were quasi-judicial. Therefore, the court of appeals has jurisdiction to review the proceedings by writ of certiorari.

Reversed and remanded.